IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2018

**MARLON MCKAY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-07886    James M. Lammey, Jr., Judge**

**No. W2017-00202-CCA-R3-PC**

A Shelby County jury convicted the Petitioner, Marlon McKay, of felony murder and attempted aggravated robbery. The trial court sentenced the Petitioner to an effective sentence of life plus six years. This Court affirmed the trial court's judgments on appeal. *State v. Marlon McKay*, No. W2010-01785-CCA-MR3C, 2011 WL 5335285 (Tenn. Crim. App., at Jackson, Nov. 4, 2011), *perm. app. denied* (Tenn. Apr. 12, 2012). The Petitioner filed a petition for post-conviction relief in which he alleged, as relevant on appeal, that his trial counsel was ineffective for: (1) not challenging his forty-eight hour hold when his arrest was not supported by probable cause; and (2) not timely filing a motion for new trial or a notice of appeal. The post-conviction court denied relief, and the Petitioner appeals. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the appellant, Marlon McKay.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Gavin Smith and Stacy M. McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the Petitioner's participation in the attempted robbery of and killing of the victim, Maurice Taylor, in August 2008. For these offenses, the Petitioner

and his co-defendant were charged with attempted aggravated robbery and first degree felony murder, but their cases were severed before trial. In our opinion affirming the Petitioner's convictions, we summarized the facts presented at trial as follows:

### State's Proof

The victim's mother, Robin Taylor, testified that at the time of his death the victim was twenty-four years old and had been sharing a home on Cella Street with his older brother, Mareo Taylor.

Calvin McKissack, a resident of Cella Street, testified that he was outside his home on the evening of August 19, 2008, watching a friend repair a lawnmower when he became aware of a Mercury Cougar automobile that kept stopping under the streetlight in front of the house across the street, pulling off again, and then returning four or five minutes later to stop in the same spot. The windows were tinted but cracked open, and he was able to see two African-American men inside who kept looking back over their shoulders each time they pulled in front of the house. After having seen the men circle the block in the same fashion four or five different times, McKissack and his friend decided to go inside. Approximately five minutes later, McKissack heard gunshots, went back outside, and learned that the victim, who lived several doors down, had been shot in his yard.

Brooke Howard, who also resided on Cella Street at the time of the shooting, testified that she was returning home from work at about 10:30 p.m. on August 19, 2008, when her suspicions were aroused by the sight of an unfamiliar white car that traveled slowly down the street two or three different times. About twenty or thirty minutes later, she was in her bedroom when she heard gunshots.

The victim's brother, Mareo Taylor, testified that he and the victim were sharing a home on Cella at the time of the shooting and that the victim, who had only a part-time job, sold marijuana to supplement his income. Several hours before the shooting occurred, he asked the victim to give him $10, but the victim told him he had to buy some marijuana first. At about 8:30 or 9:00 p.m. that night, the [Petitioner] stopped by the home to see the victim, stayed a few minutes, and then left. As the [Petitioner] walked through the kitchen, Taylor saw that he was carrying a large plastic bag, but he was unable to see its contents.

2

Approximately two hours later, Taylor was watching television with his girlfriend when the victim received a telephone call and then walked out the kitchen door to the driveway. Almost immediately after the victim shut and locked the door behind him, Taylor heard the victim say his name followed by the sound of a gunshot. He looked out the window, saw the victim staggering beside the kitchen door, and tried to reach him by exiting the kitchen door. He did not have his door key on him, however, so he then ran out the living room door and around the house to the kitchen door. By the time he reached the victim approximately thirty to forty-five seconds later, the victim was lying on the ground gasping for air. Taylor testified that the victim was not armed and that there were no weapons in the home.

Marvin Riley, who was living with a friend on Cella at the time of the shooting, testified that he heard a single gunshot at about 11:00 p.m. on August 19, 2008, looked out the front door of his friend's home, and saw what appeared to be the victim lying on the ground and two African-American men running side by side down the sidewalk to a light-colored car parked on the street. He said that the men got into the vehicle and drove off, turning right onto Hamilton Street toward Lamar Avenue.

Antonio Archie testified that sometime between 10:00 and 11:00 p.m. on August 19, 2008, he had just started his turn off Hamilton Street en route to his home on Cella when a light-colored, two-door car with two African-American men inside pulled off rapidly from where it had been stopped on Cella, accelerated down the street, and turned onto Hamilton headed toward Lamar. When Archie arrived home, he heard a commotion and saw the victim's brother's girlfriend calling 9-1-1 while the victim's brother held the victim in his arms.

The [Petitioner's] former live-in girlfriend, Tracy Taylor, testified that the defendant borrowed her 1997 silver Mercury Cougar at about 8:45 p.m. on August 19, 2008. The [Petitioner] also used her cell phone that night. The witness identified a photograph of a revolver that she said she had seen around her home during the time that the [Petitioner] lived with her. On cross-examination, she testified that during the time the [Petitioner] lived with her, he smoked marijuana and occasionally took Xanax bars mixed with a prescription cough syrup containing Promethazine, otherwise known by its street name of "syrup." She said that the [Petitioner] smoked marijuana with her on August 19, 2008, before he borrowed her car. She conceded it was possible that the [Petitioner] also used Xanax and Promethazine that day.

3

Officer Lesley Jones of the Memphis Police Department, who responded to the reported shooting at approximately 11:20 p.m., testified that he and several fellow police officers attempted CPR on the victim for approximately seven to nine minutes until fire department officers arrived and pronounced him dead.

Walter Spencer, another resident of Cella Street, testified that on the night of August 19, 2008, he heard a gunshot followed by the sound of car doors shutting and a vehicle "speeding off." When he looked out the window, he saw a light-colored car turning right at the stop sign onto Hamilton.

Susan Acerra, an investigator with the Shelby County Medical Examiner's Office, testified that when she responded to the scene of the shooting, she found the victim lying on his back on the ground with a gunshot wound in his chest. Her inventory of his person uncovered $1,163.75 in cash, a cell phone, a tube of chapstick, and a butane lighter.

Cell phone records of the [Petitioner's] ex-girlfriend, Tracy Taylor, were introduced as an exhibit by stipulation of the parties.

Officer David Payment of the Memphis Police Department's Crime Scene Investigation Unit identified various photographs he took of the crime scene, including ones that showed an empty clear plastic bag that was found beside the victim's foot and another clear plastic bag containing .41 grams of marijuana, which was found on the ground beside the victim's shoulder. He said he found no weapons or bullet casings at the scene.

Detective Samuel McMinn of the Memphis Police Department's Investigative Support Unit testified that, as part of his investigation, he transported Tracy Taylor and the [Petitioner] to the Homicide Office on August 20, 2008.

Sergeant James Max of the Memphis Police Department's Homicide Unit testified that he interviewed the [Petitioner] in two separate sessions on August 22, 2008. He said that the [Petitioner] denied any involvement in the homicide, telling him that he had bought marijuana from the victim on August 19, 2008, but by 9:15 p.m. was back home and in for the night. The [Petitioner] also denied owning a gun. Later, Sergeant Max received Tracy Taylor's cell phone records, which revealed that a call had been

4

placed from her phone to the victim at 11:05 p.m. on August 19, 2008, which had hit off a cell phone tower located only a couple of blocks from the crime scene.

On cross-examination, Sergeant Max acknowledged that there were several calls back and forth that night between the victim's phone and Tracy Taylor's phone, including two short duration calls from Tracy Taylor's phone to the victim's phone that were placed after the shooting. On redirect examination, he said that the call history of Ms. Taylor's phone did not reflect those calls and that the [Petitioner] later told him that he had deleted the victim's number from the phone.

Detective Michael Garner of the Memphis Police Department's Investigative Support Unit testified that on August 27, 2008, he and his partner were instructed to escort the [Petitioner] to a lot near Hamilton Street where, according to the [Petitioner], Courtney Bishop had thrown the gun used in the homicide out of their car window. The officers were unable to locate the weapon in that lot, however, and as they continued to drive about the area, the [Petitioner] asked him to pull over, telling him that he knew where the gun was and wanted to talk to Detective Ragland about it.

Lieutenant Barry Hanks of the Memphis Police Department testified that he used Tracy Taylor's cell phone records during a third interview with the [Petitioner] on August 22, 2008, to show him that he had to have been in the vicinity of the victim's home, rather than at his own home, when he telephoned the victim shortly before the shooting. He said that the [Petitioner] responded by looking down and saying, "[Y]ou got me, don't you[?]" The [Petitioner] then gave a statement detailing his participation in the crime. In the statement, the [Petitioner] said that he drove Courtney Bishop to the victim's home, using Tracy Taylor's vehicle, with the intention to rob the victim. The [Petitioner] also admitted that he supplied the gun used in the robbery. He claimed, however, that he began to have second thoughts about the robbery once they reached the victim's home and was not present when Bishop shot the victim. The [Petitioner's] statement reads in pertinent part:

> I was riding down Brower and I seen Courtney [Bishop]. He was standing outside and I had stopped to pick him up. We was tripping about some money and he got in the car. That's when [the victim] called about 30 minutes after [Bishop] got in the car. That's when we decided to try and

5

take [the victim's] money. I rode around for a minute thinking this is wrong. This ain't it. But it was more like I guess we need to do because we both needed some money. As I drove around, I parked the car for a minute. We jumped out and walked up Cella Street for a minute. I was really contemplating on should we do it, should I not 'cause I know him and I've never did anything like that before, never. Really, I got cold feet and I left the phone in the car to go back to the car to buy some time to think. Walking back to the car, that's when I decided it wasn't worth it. That's when I guess [the victim] come out of the house and I heard a shot. [Bishop] came running towards me and I said what the fuck did you do—what the fuck you do? And he said he shot him in the leg. I said you didn't kill him, did you? And he said naw, man, 'cause he reached for his leg. While we were in the car, we driving off by this time. The next day I seen the news and they said [the victim] was dead.

The [Petitioner] said that he drove both to and from the victim's house and that he knew the victim had money because the victim had been trying to buy some marijuana.

Dr. Lisa Funte, a medical examiner with the Shelby County Regional Forensic Center who reviewed the autopsy report of the victim's body, testified that the cause of death was a single gunshot wound to the chest.

Lieutenant Bart Ragland of the Memphis Police Department testified that on August 27, 2008, he checked the [Petitioner] and Bishop out of jail in order for them to direct him and other officers to the location of the murder weapon. He said that when the officers were unable to locate the weapon at the place indicated, Bishop was driven back to jail. In the meantime, the [Petitioner], who had asked to speak to him, divulged that he had given the weapon to a third individual. Lieutenant Ragland then contacted that person, who dropped off the weapon in the bushes outside a restaurant down the street from a police station. Lieutenant Ragland identified a photograph of the weapon, which had previously been identified by Tracy Taylor as one with which she was familiar, as the .357 revolver that he had recovered from the bushes outside the restaurant. He said that both the weapon and the bullet that had been recovered from the victim's body were transported to the Tennessee Bureau of Investigation

6

("TBI") laboratory for testing.

TBI Special Agent Cervinia Braswell, an expert in firearms identification who conducted the testing of the bullet and gun, testified that the bullet recovered from the victim's body was fired through the barrel of the gun.

Sergeant Joe Stark of the Memphis Police Department's Homicide Unit, who participated in the [Petitioner's] August 22, 2008 statement, testified that the [Petitioner] never indicated during that interview that he was under the influence of marijuana, codeine/cough syrup, or any other mind- or mood-altering substance at the time of the shooting. He acknowledged on cross-examination, however, that he never asked the defendant whether he had been under the influence of any drugs on August 19.

### Defendant's Proof

Lieutenant Ragland, recalled as a witness for the defense, testified that Tracy Taylor's cell phone records indicated that the victim had made an outgoing call to Tracy Taylor's phone at 11:05 p.m. on August 19, 2008, which was not reflected in the caller identification section of the victim's cell phone.

The [Petitioner] testified that on the day of the shooting he smoked marijuana and consumed some Promethazine with codeine, which he mixed in juice with two Xanax bars. Sometime in the afternoon, he went to the victim's house, where he purchased a quarter-ounce of marijuana that he took home and smoked with his girlfriend, Tracy Taylor, before she had to leave for a 4:00 p.m. appointment. In addition to the marijuana, he consumed more Promethazine and Xanax that afternoon. His girlfriend returned home at about 8:00 p.m. and he smoked another marijuana cigarette with her before he, in turn, left home again, taking her car and cell phone because his own phone had been disconnected for nonpayment.

The [Petitioner[ testified that as he was driving around the Orange Mound neighborhood, Courtney Bishop flagged him down and the two shared a marijuana cigarette while riding around together. He then dropped Bishop off on the street and met one of his marijuana suppliers, who provided him with a pound of marijuana on consignment, which he took to the victim at the victim's home. The victim was unhappy with the quality,

7

however, so he left with the marijuana. As he was driving around trying to find a different buyer, he spotted and picked up Bishop again. Neither he nor Bishop had any money, but both needed some, and at some point as they were sitting in the car together smoking yet more marijuana, Bishop suggested they could take money from the victim. The [Petitioner] said that he rejected the idea because it was not the right thing to do. As Bishop continued to talk about it, the [Petitioner] pointed out that Bishop did not even have a gun. In response, Bishop picked up the [Petitioner's] loaded gun, which the [Petitioner] kept by his console for protection, and told the [Petitioner] that he was going to use it to commit the robbery. The [Petitioner] said that he told Bishop "no" and that he could not do that to the victim, whom he had known since the victim was a child.

The [Petitioner] testified that he later called the victim to see if he could sell him another quarter-ounce of marijuana on credit. He said he parked down the street from the victim's house and was trying to reach him on the cell phone when Bishop suddenly jumped out of the vehicle and began walking toward the victim's home. He followed after him, calling him back to the car and asking what he was doing. He then heard a gunshot and saw Bishop running back toward the car. He panicked, ran back to the car with Bishop, and drove both of them from the scene. He asked Bishop what he had done, and Bishop told him that he had shot the victim in the leg.

The [Petitioner] testified that he dropped Bishop off and went home, where he twice called the victim to check on his welfare. No one answered, and the next morning he heard on the television news that there had been a shooting death on Cella. The [Petitioner] testified that he did not call the police or seek help for the victim because he was frightened. The [Petitioner] described his feelings of anguish and remorse at the death of the victim and said that he never intended for him to be robbed, much less shot. He also said that he was so upset about the shooting that he vomited in the car upon reaching his home that night, and again after he went inside the home.

On cross-examination, the [Petitioner] acknowledged he told police, in his statement, that he had planned to rob the victim but then got "cold feet." He further acknowledged that he never said anything about having been under the influence of drugs at the time of the shooting.

***State's Rebuttal Proof***

8

Mareo Taylor testified that he saw the [Petitioner] at his home at about 8:00 p.m. on the night of the shooting but did not see him earlier in the afternoon, despite having been home for almost the entire day.

Tracy Taylor testified that she noticed no unusual smells or signs of recent cleaning in her vehicle when she drove it to work on the morning of August 20, 2008.

Sergeant Joe Stark and Lieutenant Bart Ragland each testified that the [Petitioner] never told them that Bishop had taken his gun out of his console, as opposed to his having given it to him, or that he had tried to stop Bishop from committing the robbery.

*McKay*, 2011 WL 5335285 *1-6.

Based upon this evidence, the jury convicted the Petitioner of first degree felony murder and attempted aggravated robbery. The trial court ordered that the Petitioner serve life in prison for the felony murder conviction and six years for the attempted aggravated robbery conviction. The court ordered that the sentences be served consecutively.

## B. Post-Conviction Facts

The Petitioner filed a petition for post-conviction relief in which he alleged his trial counsel was ineffective for: (1) not challenging his forty-eight hour hold when his arrest was not supported by probable cause; and (2) not timely filing a motion for new trial or notice of appeal. At a hearing on the petition, the parties acknowledged that the Petitioner's trial counsel had suddenly and unexpectedly died between the time of the Petitioner's trial and his post-conviction proceeding. The parties then presented the following evidence: The Petitioner testified that the trial court appointed Counsel to represent him on April 20, 2010, a few weeks before his May 17 trial, because his prior attorney had to leave the case due to personal issues.

The Petitioner said that he met with Counsel a few times, maybe once before trial. He said that Counsel only met him in court, and he did not think that she ever came to the jail. The Petitioner said that Counsel did not discuss with him the details of his case, and she did not discuss with him his defense. He said that she was "focused" on intoxication as a defense and did not discuss with him anything about his abandoning the plan to rob the victim. The Petitioner said that Counsel did not review discovery with him.

9

The Petitioner recalled that Counsel argued a motion to suppress evidence against him the morning before trial. The Petitioner said he told Counsel that he had asked officers if he could speak with an attorney, specifically Craig Morton, at the time that they interviewed him. Counsel, however, did not raise this fact during the suppression hearing. Neither did she mention that he had been interviewed multiple times while held in jail before his arrest.

The Petitioner testified that he had been arrested after this incident, his arrest being August 21, 2008. He said that he had been in custody since that day. The Petitioner said that the police officers were looking for his girlfriend, Tracy Taylor, and that they had gotten a "ping" off of a cell phone tower from her phone. The Petitioner was riding as a passenger at the time that law enforcement officers pulled over Ms. Taylor.

The State informed the post-conviction court that officers brought the Petitioner in for questioning because he was the last person to see the victim alive, and the Petitioner saw him alive within thirty minutes of his death. Officers then read the Petitioner his *Miranda* warnings, and the Petitioner gave statements. The Petitioner was booked into jail just after midnight, on the morning of August 22, 2008. Law enforcement officers placed a forty-eight hour hold on the Petitioner on the evening of August 22, 2008, when they realized that he was more than a witness.

The Petitioner testified that, after his arrest, he went before a judge "two/three days later" and was appointed an attorney, his initial counsel. Detective Michael Garner checked him out of jail on August 27, 2008, so the Petitioner could locate the murder weapon. He did not have legal representation at that time.

The Petitioner said that, at his motion to suppress, Counsel did not argue the forty-eight hour hold or his lack of representation when locating the murder weapon. The motion to suppress was based on his contention that he asked for, but was denied, access to an attorney. The Petitioner recalled that while he was incarcerated, a detective came to talk to him, and he told the detective that he did not want to speak with him but that he wanted an attorney. He ended up in the detective's office on August 22, and this was the basis for the motion to suppress.

The Petitioner said that he did not recall Counsel speaking with any of the witnesses, but he agreed that she had hired an investigator. The Petitioner complained that Counsel did not rebut the insinuation at trial that he was a menacing person by calling any character witnesses on his behalf. He said that she did not properly investigate the case or prepare for trial. He explained that she did not talk to any of the witnesses or obtain any pretrial statements that were taken the night of the crime.

10

The Petitioner said that Counsel did not engage in any plea negotiations with the State. The Petitioner recalled that, while the jury was deliberating, he asked Counsel if the State had ever offered him a plea deal. She said that the State had made an offer but that it was "too high" and that he would not have taken it. He said that she never conveyed any offer to him.

The Petitioner said that Counsel did not assert that he had withdrawn from the conspiracy. The two discussed that he, as he told police, had gotten "cold feet" and gone to the car to call someone. The Petitioner said that Counsel did file a motion to sever his case from co-defendant Bishop's case.

The Petitioner testified that Counsel did not timely file his motion for new trial. The Petitioner said that he was, therefore, only able to seek plain error review on appeal. The Petitioner said that he was granted the right to seek a late appeal. In the appeal, however, Counsel did not raise the forty-eight-hour hold or that he was arrested without probable cause. She focused the appeal only on an issue about jury instructions and the sufficiency of the evidence.

Post-conviction counsel informed the post-conviction court that the Petitioner was arrested on August 21, 2008[1] and that he did not appear before a judge until August 25, 2008. Post-conviction counsel said that the Petitioner was not represented by any attorney until September 16, 2008. The post-conviction court said the main issue was whether there was probable cause to arrest the Petitioner.

During cross-examination, the Petitioner testified that the trial court had originally appointed Counsel's boss, ("Previous Counsel"), to represent him. He was unaware at that time that Counsel worked with Previous Counsel. He agreed that Counsel had an investigator whom she presumably spoke with. The Petitioner said that he and Counsel first discussed the trial on the morning of trial. The Petitioner agreed that he did not know whether Counsel attempted to talk to any of the witnesses. He further agreed that he did not offer Counsel the name of any factual witnesses that could testify on his behalf.

The Petitioner agreed that Counsel gave him a full copy of the discovery in his case. He further conceded that he was unsure whether Counsel talked to any witnesses or visited the crime scene.

During redirect examination, the Petitioner testified that Counsel never said that

---

[1] There is some discrepancy in the record about whether the Petitioner was arrested on August 21, August 22, or August 23.

she interviewed any witnesses. He clarified that it may have been Previous Counsel who sent him the discovery.

Upon questioning by the post-conviction court, the Petitioner testified that he was unsure of the date that Counsel took over his case from Previous Counsel. The Petitioner said he was arrested on August 21, 2008, and that he gave a statement the next day that should have been suppressed. The statement, he agreed, was given on August 22, 2008, at 6:27 p.m., which was twenty-five hours after he was taken into custody.

Stacy McEndree, with the District Attorney's Office, testified that she had been a prosecutor for over seventeen years and that she had been the prosecutor in this case. She recalled that she prosecuted both the Petitioner and his co-defendant, Mr. Bishop, but at separate trials about a month apart. Ms. McEndree explained that both defendants had given a statement to police, so the State intended to try the cases separately.

Ms. McEndree explained that Previous Counsel had originally been assigned the Petitioner's case. Counsel worked for Previous Counsel and had worked on this case. Previous Counsel had worked with Counsel on the Petitioner's case and had intended for her to sit with him and try the case at trial. Twenty-seven days before trial, Previous Counsel asked to be relieved and for Counsel to be assigned to the case. The trial court offered to give Counsel more time, but she said such was unnecessary because she had been working on the case.

Ms. McEndree said that Counsel frequently asked her if the State had an offer for a plea agreement. Ms. McEndree said that the State did not because, while Mr. Bishop was the shooter, the State's theory was that the Petitioner set up the robbery. She explained that the Petitioner was older and larger than Mr. Bishop and that he was the one who knew the victim. Ms. McEndree said that the State never offered the Petitioner a plea agreement.

Ms. McEndree addressed the forty-eight-hour hold/probable cause issue saying that there was probable cause for the Petitioner's arrest. She explained that the victim was shot and killed on August 19, 2008. When officers arrived at the scene, they spoke with multiple witnesses who said that there had been a car circling the area. The witnesses said that it was not a car that was supposed to be in that area. The witnesses described the vehicle in detail, giving the color, make, model, and information that the vehicle had a spoiler. Witnesses said that there were two black men in the car at the time and that it circled the block repeatedly, each time stopping near the victim's house, which the victim's neighbors found suspicious. The car circled the block between five and seven times. Witnesses said that the same vehicle sped away from the scene at a high rate of speed and turned right after the shots were fired.

Ms. McEndree said that law enforcement officers had also spoken with the victim's brother, who told them that the Petitioner was the last person to see the victim alive. The victim's brother told the officers that the Petitioner had been by the victim's house less than a half an hour before the victim was shot and killed, having come to purchase marijuana from the victim. Law enforcement officers also discovered that the description of the vehicle seen speeding away from the murder scene matched the Petitioner's girlfriend's vehicle. When officers spoke with the Petitioner and his girlfriend, they learned that the Petitioner had been in possession of his girlfriend's vehicle and cell phone at the time of the murder. The officers also discovered that the Petitioner's girlfriend's cell phone was the last number that had called the victim's phone shortly before his death. Officers then used records from the Petitioner's girlfriend's cell phone, which the Petitioner was in possession of at the time of the murder, to determine that the Petitioner was on the victim's block at the time of the murder. The Petitioner's first statement was that he was nowhere near the crime scene until he was confronted with the phone records. Ms. McEndree said that the Petitioner was originally brought in to give a statement but, after officers spoke with him and looked at the evidence, they arrested him.

Ms. McEndree addressed the motion for new trial, saying that Counsel had missed the thirty day time limit. Counsel was still, however, allowed to file an appeal. Ms. McEndree said that Counsel fought "hard" for the Petitioner. Ms. McEndree said that Mr. Bishop also appealed and his conviction was ultimately affirmed. Ms. McEndree opined that, had the motion for new trial been timely filed, it would not have changed the result.

Ms. McEndree said that Counsel believed in the Petitioner and that the two had become close. She said that they worked well together and that Counsel only had positive things to say about the Petitioner. Counsel was upset when she thought that Mr. Bishop may have his sentence reduced on appeal, which ultimately did not happen. Ms. McEndree said that Counsel had been a prosecutor before practicing criminal defense. She said that Counsel could not have fought harder on the Petitioner's behalf and that she did not leave a "stone unturned."

Ms. McEndree recalled that when the Petitioner testified at trial, he admitted that he had repeatedly lied to police. He said that he did so hoping it would get him a lower charge. The Petitioner, she said, understood the trial proceedings and the consequences of his actions.

Ms. McEndree testified that the proof against the Petitioner was overwhelming. He gave a statement to police that included that he was at the victim's house and planned

13

to rob the victim. He had sold the victim marijuana, and the victim had said it was not any good, which upset the Petitioner. The Petitioner said that he returned to rob the victim and that he took a gun for protection. While the Petitioner said he tried to back away from the murder, this evidence was not supported by eye witness testimony, and the Petitioner admitted he never conveyed this fact to Mr. Bishop. Ms. McEndree said that she could not imagine what Counsel could have done differently to change the outcome of this case.

During cross-examination, Ms. McEndree testified that Counsel accompanied Previous Counsel during some of their earlier meetings on this case, and that it was Ms. McEndree's original understanding that Counsel would be sitting second chair on the case.

Ms. McEndree reiterated that she did not make any plea offers to the Petitioner. She expounded that the Petitioner was eleven years older than Mr. Bishop, and Mr. Bishop was "a little slow" and "a lot smaller" than the Petitioner. Further, Mr. Bishop did not know the victim previously, and the Petitioner did.

Ms. McEndree said that Counsel had a multi-pronged defense. She attempted to mitigate his culpability to anything less than first degree murder by highlighting that the Petitioner was not the shooter, that he backed away from the murder, and that he was intoxicated. Ms. McEndree also said that Counsel came to her office to review the State's file on the case. Ms. McEndree also gave Counsel the statements of any witness involved in the case.

Ms. McEndree agreed that Counsel filed a motion to suppress. She said that the motion alleged that the Petitioner had attempted to, or had in fact, spoken with an attorney, Mr. Morton, before he gave his statement. Ms. McEndree spoke with Mr. Morton who denied that he had spoken with the Petitioner. Ms. McEndree was unsure whether Counsel raised probable cause, but Counsel did not raise the forty-eight-hour hold issue. Ms. McEndree said that, at the time of this case, that was a "non-issue," the seminal case on the issue not having yet been released. Ms. McEndree agreed that the forty-eight hour hold issue was raised in co-defendant Bishop's case, but she said that most attorneys thought that this argument was likely unsuccessful, so it was not a frequently raised issue. Ms. McEndree acknowledged that the Court of Criminal Appeals reversed co-defendant Bishop's case based on the forty-eight-hour hold issue, but she said that the facts surrounding the issue were different. Mr. Bishop was "picked up" by law enforcement officers later and based solely on the Petitioner's statements. The Petitioner, however, was brought in for questioning based upon the facts that led police to suspect him as being involved in the murder.

Ms. McEndree detailed facts known to police before the Petitioner's arrest: witnesses had seen a light colored car circling with two black men in the vehicle and leaving quickly after shots were fired; witnesses offered a make of the vehicle; the victim's brother said that the Petitioner saw the victim thirty minutes before his death; the victim's brother gave law enforcement officers the victim's cell phone, which showed incoming and outgoing calls, and officers learned that the last phone call was between the victim's phone and the Petitioner's girlfriend's phone. Officers then learned that the Petitioner's girlfriend owned a vehicle matching the description of the car given by witnesses.

On August 21, 2008, officers saw the Petitioner with his girlfriend in the vehicle matching the description of the vehicle at the crime scene. The victim's girlfriend, Ms. Teller, drove to work, and the Petitioner accompanied her. Officers asked them to come to the police station to give statements and be interviewed. The Petitioner was not placed on a forty-eight-hour hold until the early morning hours of August 22, 2008.

The Petitioner signed a waiver of *Miranda* rights at 11:17 a.m. on August 22, 2008, and then he gave a statement at 4:08 p.m. that same day. The Petitioner gave another statement, the one used as evidence at trial, at 8:00 p.m. that same day.

Ms. McEndree identified portions of the transcript in which Officer McMinn testified that he located the Petitioner on August 20, 2008, and that he contacted the Petitioner's girlfriend through her father. Ms. McEndree identified where Officer McMinn testified that he met the Petitioner's girlfriend in a parking lot and that the Petitioner was with her. He said he detained them both on that date.

Ms. McEndree agreed that the victim's brother's testimony included that the Petitioner had been to his and the victim's home between 8:30 and 9:30 p.m. on the day of the shooting. She further acknowledged that the 911 call did not come in until 11:09 p.m. Ms. McEndree said that law enforcement officers knew before they interviewed the Petitioner on August 21 that his girlfriend's cell phone had pinged off a tower in the vicinity of the victim's house, and they confronted him with this information during the interview.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition, finding that the Petitioner failed to prove that Counsel was ineffective in her representation of the Petitioner. The post-conviction court did find that Counsel was deficient for failing to timely file a motion for new trial but that the Petitioner was not prejudiced in this regard because there was "sufficient probable cause to arrest [the] Petitioner." It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition for post-conviction relief because his trial counsel was ineffective for: (1) not challenging his forty-eight hour hold when his arrest was not supported by probable cause; and (2) not timely filing a motion for new trial or notice of appeal. The State counters that the Petitioner failed to establish his claim of ineffectiveness with adequate proof, that he did not prove that there was not probable cause for his arrest, and that he did not prove that his statement or evidence would have been suppressed had counsel filed a motion based on the forty-eight-hour hold. The State further contends that the Petitioner did not prove he was prejudiced by Counsel's failure to timely file a motion for new trial.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial,

a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at

694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S.

## A. Probable Cause

The first issue we must address is whether law enforcement officers had probable cause to arrest the Petitioner. "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *State v. Echols*, 382 S.W.3d 266, 277-78 (Tenn. 2012) (quoting *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997)).

At the post-conviction evidentiary hearing, the parties presented evidence about what the State knew at the time of the Petitioner's arrest. Officers responded to the scene of a shooting murder. The witnesses there identified a light-colored car that had been circling the neighborhood and stopping repeatedly at the victim's house before shots were fired. While the witnesses' statements differed slightly in the make and model of the car, some of them identified the vehicle as a Cougar. The victim's brother told law enforcement officers that the Petitioner had been to his home to meet the victim shortly before this shooting. The victim's brother provided law enforcement officers with the victim's phone, which showed that the last phone call that the victim received was from the Petitioner's girlfriend's phone. Law enforcement officers learned that the Petitioner's girlfriend had recently purchased a vehicle matching the description given by witnesses, and it was a Cougar. They then spoke with the Petitioner's girlfriend's father and attempted to locate the Petitioner's girlfriend. When they did so, the Petitioner was with her in her car, which matched the description of the vehicle described at the scene of the shooting. Officers asked the Petitioner's girlfriend to come to the station for questioning, and the Petitioner offered to accompany her. At the station, the law enforcement officers learned that the Petitioner had been in possession of his girlfriend's phone and car around the time of the murder, although he denied being near the scene of the crime. Law enforcement officers then confronted him with the fact that the phone was "pinging" off a tower near the crime scene, and the Petitioner admitted his involvement in this murder. The officers then arrested the Petitioner. The post-conviction court found that the Petitioner's arrest was indeed supported by probable cause.

Upon review, we conclude that the record supports the post-conviction court's determination. These aforementioned facts were sufficient to warrant a prudent person in believing that the Petitioner was involved in the murder. Therefore, Counsel was not deficient for failing to argue that the Petitioner's arrest was not supported by probable cause.

18

## B. Forty-Eight-Hour Hold

The Petitioner contends that Counsel was ineffective for failing to raise the forty-eight-hour hold issue in his motion to suppress. He asserts that law enforcement officers wrongfully held him for longer than forty-eight-hours before he was brought before a magistrate. *See Gerstein v. Pugh*, 420 U.S. 103 (1975). He further contends he was prejudiced in that his statement to the police and other evidence, namely the murder weapon, would have been suppressed had Counsel done so. The State counters that the Petitioner was in fact taken before a magistrate within forty-eight hours and further that the Petitioner did not prove that his statement or evidence would have been suppressed. We agree with the State.

A judicial determination of probable cause that occurs within forty-eight hours of a defendant's arrest is generally sufficient to satisfy the Fourth Amendment, unless there is evidence that the probable cause determination was unreasonably delayed for the purpose of gathering additional information to justify an arrest, was motivated by ill will toward the defendant, or constituted a "'delay for delay's sake.'" *Huddleston*, 924 S.W.2d at 672 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). "[I]f the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Id*. at 675.

The Tennessee Supreme Court heard and decided this issue on similar facts in the Petitioner's co-defendant's case, the case of Courtney Bishop. *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014). In *Bishop*, the defendant argued that his arrest was illegal. On appeal, this Court *sua sponte* found that the State had violated *Gerstein* because the arrest was for the basis of gathering more information. Reviewing the issue, our supreme court reversed, finding:

> Our reading of the record leads us to conclude that Mr. Bishop's lawyer was focused chiefly on his argument that the police lacked probable cause to arrest Mr. Bishop, rather than on whether the "48-hour hold" was obtained to enable the police to gather additional evidence to justify the arrest. Because Mr. Bishop did not raise the latter issue at trial, neither party presented the sorts of evidence that one would have expected to be introduced on this issue. Accordingly, the record is quite equivocal on this point.
>
> Had Mr. Bishop asserted plain error with regard to his claim that the police improperly detained him following his arrest for the purpose of gathering additional evidence, he would have had the burden of

19

demonstrating that he was entitled to relief. *State v. Jordan*, 325 S.W.3d at 58. Based on this record, we have concluded that a plain error argument would have run aground because Mr. Bishop would not have been able to demonstrate that considering the error was necessary to do substantial justice.

Mr. Bishop was arrested with probable cause. He subsequently confessed three times to shooting Maurice Taylor. On one of those occasions he was testifying under oath before a jury. Under these circumstances, it is difficult to perceive how substantial justice requires the reversal of his conviction for first-degree felony murder in perpetration of an attempted aggravated robbery.

Based on this record, we have determined that the Court of Criminal Appeals erred by overlooking Mr. Bishop's waiver of the *Gerstein* issue and by failing to employ the plain error analysis when it addressed this issue. Had the Court of Criminal Appeals employed the plain error analysis, it would have concluded, as we have, that Mr. Bishop is not entitled to relief based on this issue.

*Bishop*, 431 S.W.3d at 44-46.

The evidence in this case shows that the Petitioner was arrested on August 21, 2008. He gave a signed statement implicating himself in the murder on August 22, 2008. While the record is unclear, the Petitioner may not have been officially brought before a magistrate until August 25, 2008. Even using the Petitioner's August 25th date, his statement would still not have been suppressed because he did not give it beyond the forty-eight hour time period mandated by *Gerstein*. Further, however, the Petitioner must prove this allegation by clear and convincing evidence, which he did not do. Finally, as previously stated, law enforcement officers had probable cause to arrest the Petitioner based upon the facts known to them at the time he was taken into custody. Accordingly, we conclude that the Petitioner is not entitled to relief.

### C. Motion for New Trial

Finally, the Petitioner contends that Counsel was ineffective for not timely filing his motion for new trial. He further contends that he was prejudiced because he would likely have been successful on the forty-eight hour hold issue, the suppression of his statements based on *Miranda*, and the lack of probable cause for his arrest. The State counters that the Petitioner did not prove that he was prejudiced by Counsel's failure. We agree with the State.

The most applicable case on this issue is *Wallace v. State*, which supports the Petitioner's contention that Counsel's deficiency in failing to timely file his motion for new trial was ineffective and resulted in his case not being subjected to "the adversarial appellate process." 121 S.W.3d 652, 659 (Tenn. 2003). In *Wallace*, as a result of the untimely filing, the petitioner did not receive appellate review of specific issues raised in the motion for new trial regarding alleged errors at trial as to evidentiary issues and comments the trial judge made in front of the jury. In determining whether *Wallace* was entitled to post-conviction relief as a result of trial counsel's untimely filing of the motion for new trial, our supreme court held "a petitioner in a post-conviction proceeding must establish that he or she intended to file a motion for new trial and that but for the deficient representation of counsel, a motion for new trial would have been filed raising issues in addition to sufficiency of the evidence." *Id*. Further, the court held, "[a]s a direct result of counsel's ineffective assistance, the defendant was procedurally barred from pursuing issues on appeal, and the State's case was not subjected to adversarial scrutiny upon appeal." *Id*. at 660.

In this case, Counsel was granted a delayed appeal, appealing the sufficiency of the evidence, and Counsel appealed other issues pursuant to a plain error review. This court found there were no issues having merit on appeal. The Petitioner's case differs from *Wallace* because it was subject to adversarial scrutiny. Further, the Petitioner cannot prove that he was prejudiced because, as previously stated, he did not offer proof that he would have been entitled to appellate relief, had any of the issues been raised. Relief at this stage in the proceedings necessitates proving by clear and convincing evidence that, but for Counsel's failure, he would have been entitled to appellate relief. He has not met this burden and, as such, he is not entitled to relief.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

21